IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CALBRUCE JAMAL GREEN,                          3:11-CV-00876-BR

          Plaintiff,

                                               OPINION AND ORDER

v.

TRI-COUNTY METROPOLITAN
TRANSPORTATION DISTRICT OF
OREGON, a municipal
corporation,

          Defendant.


**DAVID B. SHANNON**
Todd & Shannon
111 E. Historic Columbia River Highway
Troutdale, OR 97060
(503) 232-2600

**MATTHEW G. MCHENRY**
Levine & McHenry LLC
1001 S.W. Fifth Avenue
Suite 1414
Portland, OR 97204
(503) 546-3927

          Attorneys for Plaintiff


1 - OPINION AND ORDER

**ERIK VAN HAGEN**
Deputy General Counsel
TriMet
4012 S.E. 17th
Portland, OR 97202
(503) 962-4841

       Attorneys for Defendant Tri-County Metropolitan
       Transportation District of Oregon

**BROWN, Judge.**

This matter comes before the Court on Defendant Tri-County Metropolitan Transportation District of Oregon's Motion (#42) for Summary Judgment.  On October 30, 2012, the Court heard oral argument on Defendant's Motion and took the matter under advisement on November 7, 2012.

For the reasons that follow, the Court **GRANTS** Defendant's Motion.

<u>**BACKGROUND**</u>

The following facts are taken from the Joint Statement of Agreed Facts and the parties' summary-judgment materials and are undisputed unless otherwise noted:

Defendant Tri-County Metropolitan Transportation District of Oregon (TriMet) is a public entity that provides bus and rail service in Multnomah, Washington, and Clackamas Counties.  It is undisputed that TriMet is subject to Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112, *et seq.*

2 - OPINION AND ORDER

Plaintiff Calbruce Jamal Green has a seizure disorder; a mixed receptive and expressive language disorder; gross cognitive, perceptual, and intellectual-cognitive processing defects that limit his life activities; memory problems; and mild mental retardation.  Plaintiff's reading and sentence completion abilities are at a fifth-grade level, and he has a verbal IQ of 55.  Plaintiff lives independently, but he receives assistance with certain activities of daily living such as grocery shopping and money management.  Plaintiff also receives assistance to ensure he takes his medications daily.  It is undisputed that Plaintiff is an individual with a disability within the meaning of the ADA.

Plaintiff is able to ride TriMet buses and trains as long as he is familiar with the route to his destination.  Plaintiff often receives assistance from caregivers as to new routes or destinations on TriMet.  Plaintiff also is usually able to ask TriMet operators for assistance.

On December 7, 2009, Plaintiff was using TriMet to travel from Gresham to his home in North Portland.  Plaintiff took a TriMet light-rail train from Gresham to the Rose Quarter Station. Plaintiff intended to transfer at the Rose Quarter Station to the Line 4 TriMet bus, which would take him within walking distance of his residence.

Shortly before 9:30 p.m. on December 7, 2009, TriMet bus

operator Rick Gallagher had completed his work day and intended
to return his bus (Bus #1) to the TriMet garage on S.E. Powell
Boulevard.  Also at that time TriMet bus operator Liza Mitzel was
driving a Line 4 bus (Bus #2) carrying passengers towards the
Rose Quarter Station when Bus #2 suffered a defect, which Mitzel
reported.  Mitzel was told to trade Bus #2 at the regular Line 4
stop at the Rose Quarter Station for a bus that was functioning
properly.

TriMet dispatch then called Gallagher and directed him to
take Bus #1 to the Rose Quarter Station to trade out for
defective Bus #2.  TriMet directed Gallagher to bring Bus #2 back
to the garage while Mitzel continued on the Line 4 regular route
to North Portland in Bus #1.

Gallagher arrived at the Rose Quarter Station before Mitzel.
When Gallagher arrived, Bus #1 still displayed "Powell Garage" as
its destination.  Gallagher pulled into the station and informed
people waiting at the stop that Bus #1 would become a Line 4 bus
and continue on to North Portland as soon as Bus #2 arrived.
Because it was a cold night Gallagher invited anyone waiting to
board and to wait inside Bus #1 until Bus #2 arrived.  At that
point Plaintiff boarded Bus #1 and presented an Honored Citizen
Identification Card[1] to Gallagher.  Plaintiff asked Gallagher

---

[1] The record reflects elderly, impoverished, or disabled
individuals are entitled to Honored Citizen ID cards.

about the destination of Bus #1.  Gallagher explained Bus #1
would become a Line 4 bus and proceed on the Line 4 route after
Bus #2 arrived and its passengers were transferred to Bus #1.
Plaintiff appeared confused and asked Gallagher several times
about the destination of Bus #1 and began to use an elevated tone
of voice.  Gallagher told Plaintiff that he was "welcome to wait
outside" on the station platform instead of inside the bus if it
would make Plaintiff less concerned.  Plaintiff then exited
Bus #1.

Shortly thereafter while Plaintiff was still at the station,
Mitzel arrived with Bus #2.  Mitzel advised her passengers that
Bus #2 was not functioning properly and told them that Bus #1 was
going to continue on as the Line 4 bus.  All of the passengers on
Bus #2 exited and boarded Bus #1.

After the passengers disembarked from Bus #2, Plaintiff
boarded Bus #2.  Mitzel was gathering her personal items from the
operator's cab and advised Plaintiff that Bus #2 was out of
service.  Mitzel further advised Plaintiff that if he wanted to
take a Line 4 bus, he needed to exit Bus #2 and get onto Bus #1.
It appears from the video of the events submitted by the parties
that Mitzel gestured towards Bus #1 as she told Plaintiff that he
needed to board Bus #1.

Plaintiff did not respond to Mitzel and did not exit Bus #2.
Instead Plaintiff sat down at the back of Bus #2.  Gallagher told

Mitzel that he would deal with Plaintiff so Mitzel could return to driving Bus #1 on the usual Line 4 route.  Mitzel exited Bus #2 and prepared to drive Bus #1.

Gallagher advised Plaintiff that Bus #2 was out of service and that he should get on Bus #1 if he wanted to take a Line 4 bus or get off of Bus #2 and wait for the next Line 4 bus. Plaintiff did not respond to Gallagher and did not exit Bus #2.

Gallagher advised Plaintiff that if he did not leave Bus #2, Gallagher would have Plaintiff removed.  Plaintiff did not respond to Gallagher and did not leave Bus #2.  At that point Gallagher noticed Beaverton Transit Police Officer Keith Welch parked nearby.  Gallagher advised Officer Welch that he needed to have Plaintiff removed from Bus #2.  Officer Welch boarded Bus #2, and Gallagher got off to contact dispatch and to explain the reason for his delay.  Mitzel and Gallagher's interactions with Plaintiff on Bus #2 lasted between three and five minutes.

Ultimately Officer Welch and Portland Police Officer Jack Blazer[2] removed Plaintiff from Bus #2, transported Plaintiff to jail, and booked him.  Plaintiff was subsequently released, but he was cited and excluded from TriMet for violating the TriMet Code.  Following an administrative hearing on the citation, the

---

[2] Officers Welch and Blazer and the Cities of Portland and Beaverton are no longer Defendants in this matter.  Accordingly, the actions of Officers Welch and Blazer are not relevant to TriMet's Motion for Summary Judgment.

exclusion was upheld and Plaintiff was restricted from using the TriMet system for 60 days.

Gallagher did not write a report of the incident on that night because his dispatcher did not request that he do so and, according to Gallagher, incident reports are generally written only for accidents or injuries to passengers that result from TriMet's actions.

On May 7, 2010, TriMet's Claims Department asked Gallagher to write a report because the Claims Department had received correspondence from Plaintiff's counsel.  In his report Gallagher described his interactions with Plaintiff and the efforts taken to get Plaintiff to leave Bus #2.

On July 21, 2011, Plaintiff filed an action in this Court against Officers Welch and Blazer, the Cities of Portland and Beaverton, Multnomah County, Brinn Culver,[3] Multnomah County Sheriff's Deputy John Doe, and TriMet asserting claims (1) under 42 U.S.C. § 1983 and *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), against the cities of Portland and Beaverton for excessive force; (2) under § 1983 and *Monell* against the cities of Portland and Beaverton for unlawful arrest; (3) against the cities of Portland and Beaverton for battery; (4) against the cities of Portland and Beaverton for assault;

---

[3] Culver is a nurse employed by the Multnomah County Sheriff's Department.

(5) against the cities of Portland and Beaverton for false imprisonment; (6) against the cities of Portland and Beaverton for malicious prosecution; (7) against Welch, Culver, Doe, and Multnomah County for negligent infliction of emotional distress; and (8) against TriMet and the cities of Portland and Beaverton for violation of Title II of the ADA.  Plaintiff seeks "general damages" as well as costs and attorneys' fees.

On March 16, 2012, the parties filed an Acceptance of Offer of Judgment in which Plaintiff noted he had accepted an Offer of Judgment from the cities of Portland and Beaverton and, therefore, his claims against the cities of Portland and Beaverton and Officers Welch and Blazer should be dismissed.

On March 21, 2012, the Court entered a Judgment in favor of Plaintiff and against the Cities of Portland and Beaverton and dismissed with prejudice Plaintiff's claims against the cities of Portland and Beaverton and Officers Welch and Blazer.

On June 15, 2012, the parties filed a Stipulation of Dismissal in which Plaintiff dismissed with prejudice his claims against Multnomah County, Culver, and Doe.

Plaintiff's sole remaining claim in this action is one against TriMet for violation of Plaintiff's rights under Title II of the ADA.

On June 22, 2012, TriMet moved for summary judgment as to Plaintiff's ADA claim.

8 - OPINION AND ORDER

On October 30, 2012, the Court heard oral argument on TriMet's Motion and allowed Plaintiff to supplement the record no later than November 2, 2012, and TriMet to respond no later than November 7, 2012.  The Court took this matter under advisement on November 7, 2012.


**STANDARDS**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Washington Mut. Ins. v. United States*, No. 09-36109, 2011 WL 723101, at *8 (9th Cir. Mar. 3, 2011).  *See also* Fed. R. Civ. P. 56(a).  The moving party must show the absence of a genuine dispute as to a material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine dispute as to a material fact for trial. *Id.* "This burden is not a light one. . . .  The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)(citation omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d

1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party.  *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010).  "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues."  *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)).

A "mere disagreement or bald assertion" that a genuine dispute as to a material fact exists "will not preclude the grant of summary judgment." *Deering v. Lassen Cmty. Coll. Dist.,* No. 2:07-CV-1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20, 2011)(citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1987)).  *See also Jackson v. Bank of Haw.*, 902 F.2d 1385, 1389 (9th Cir. 1990).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)(citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998)).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of

10 - OPINION AND ORDER

the claim, the court may grant summary judgment.  *Id.*


## <u>DISCUSSION</u>

As noted, Plaintiff's sole remaining claim in this action is against TriMet for violation of Plaintiff's rights under Title II of the ADA.

## I.  **Standards**

Title II of the ADA provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

> To establish a violation of Title II of the ADA, a plaintiff must show that (1) []he is a qualified individual with a disability; (2) []he was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities, and (3) such exclusion or discrimination was by reason of [his] disability.

*Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002)(citing *Weinreich v. Los Angeles County Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997)).

28 C.F.R. § 35.130(b)(7) provides:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program,

11 - OPINION AND ORDER

or activity.

The Ninth Circuit has made clear that even though Title II of the ADA uses the term "reasonable modifications" rather than "reasonable accommodations," those terms "create identical standards." *McGary v. City of Portland*, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004). Accordingly, Title II of the ADA imposes liability on a public entity for "not making reasonable accommodations to the known physical or mental limitations" of a user of their services. 42 U.S.C. § 12112(b)(5)(A).

In addition, in cases in which a plaintiff seeks to recover monetary damages under Title II of the ADA, the plaintiff must prove intentional discrimination on the part of the defendant. *Duvall v. County of Kitsap,* 260 F.3d 1124, 1138 (9th Cir. 2001) (citation and footnote omitted). The applicable standard is "deliberate indifference." *Id*. Deliberate indifference requires the defendant to have knowledge that harm to a federally protected right is substantially likely and to fail to act upon that likelihood. *Id*. at 1139.

**II. Discussion**

In his Complaint Plaintiff alleges the following as to his ADA claim against TriMet:

> Defendant [*sic*] was denied equal access by
> Defendant Trimet, through the actions of its
> employee acting within the course and scope of
> that employee's employment and apprised of
> Plaintiff's disability, in one or more of the
> following particulars:

12 – OPINION AND ORDER

>       A.    In failing to effectively communicate to
>             Plaintiff that the bus he was riding
>             would not service its designated route;
>
>       B.    In calling police officers rather than
>             carefully communicating to Plaintiff
>             that he needed to get off the bus and
>             board another one;
>
>       C.    In failing to communicate the fact of
>             Plaintiffs disability to police
>             officers;
>
>       D.    In failing to adequately train employees
>             to identify and/or make accommodations
>             for individuals with disabilities like
>             Plaintiff's.

Compl. at ¶ 73.  Plaintiff, therefore, asserts TriMet was liable
for the actions of its employees and/or for a failure to
adequately train its employees.

**A.    Analysis of Plaintiff's claims other than failure to
        train.**

It is undisputed that Plaintiff is a qualified
individual with a disability.  TriMet, however, contends
Plaintiff was not excluded by TriMet from participation in its
services nor by reason of his disability.

**1.    Gallagher and Mitzel's knowledge of Plaintiff's
        disability.**

TriMet asserts its actions were not taken "by
reason of" Plaintiff's disability because Mitzel and Gallagher
did not know Plaintiff was disabled.

Mitzel testified at deposition that she was
unaware from her brief interaction with Plaintiff that he had a

13 - OPINION AND ORDER

disability or that he suffered any cognitive impairment.  The
Court notes Plaintiff does not point to any evidence in the
record that supports an inference that Mitzel knew Plaintiff was
disabled.  The video submitted by Tri-Met makes clear Mitzel
conversed with Plaintiff briefly and then Gallagher took over so
Mitzel could drive Bus #1 to the other stops on Line 4; *i.e.*,
Mitzel's interactions with Plaintiff were extremely limited.

  With respect to Gallagher's knowledge of
Plaintiff's disability, Plaintiff relies on Gallagher's May 2010
report in which Gallagher noted Plaintiff was "mentally
challenged."  Decl. of Matthew McHenry, Ex. 1 at 1.  Plaintiff
points out that Gallagher stated in his May 2010 report that
Plaintiff "appeared to be confused."  McHenry Decl., Ex. 1 at 4.
At deposition Gallagher testified he stated in his May 2010
report that Plaintiff was mentally challenged based on the fact
that Plaintiff did not make eye contact with him during their
interactions, continued to ask Gallagher the same questions about
whether Bus #1 was a Line 4 bus, and then became hostile in his
questioning.

  Defendant, however, contends Gallagher was equivocal at
deposition as reflected in his testimony that Plaintiff seemed
mentally challenged, but he "wasn't positive."  Gallagher
testified:

    [T]hat's why I wrote that he possibly had a mental
    deficiency or that he, you know, now, as I'm

14 - OPINION AND ORDER

> verbalizing, could have had a possibility – a
> person who is intoxicated has difficulty
> expressing themselves, he'll as you the same
> question over and again, and doesn't seem to
> understand.  So it was an assumption that he might
> have had [a mental impairment].

McHenry Decl., Ex. 1 at 34.

Plaintiff, nevertheless, maintains his disability is apparent to others, and, therefore, Gallagher should have been aware that Plaintiff was disabled.  Plaintiff relies on the testimony of Delinda French-Davis, Plaintiff's "personal agent," who testified "once [Plaintiff] opens his mouth you know that something's not quite right."  McHenry Decl., Ex. 6 at 4. Plaintiff also points to a psychological evaluation of Plaintiff by Dr. Larry Hart conducted in February 2010 in which Dr. Hart observed:

> [Plaintiff's] posture is rigid.  His facial
> expression is bland.  His motor activity is
> essentially immobile. [Mr. Green] does not
> evidence spontaneous speech.  [Plaintiff's] speech
> is slurred and halting.  [Plaintiff] does not
> freely verbalize.  [Plaintiff's]
> auditory/receptive speech recognition shows
> impairment.

McHenry Decl., Ex. 5 at 1-2.

On this record and viewing the evidence in the light most favorable to Plaintiff, the Court concludes Plaintiff has established an issue of fact exists as to whether Gallagher was or should have been aware that Plaintiff was disabled.

**2.  Exclusion from participation in or otherwise discriminated against with regard to a public**

**entity's services, programs, or activities.**

TriMet also asserts Plaintiff was not excluded from participation in or otherwise discriminated against with regard to TriMet's services because Plaintiff did not have any right to remain on an out-of-service bus.  In fact, TriMet employees attempted to move Plaintiff to the proper bus and to assist him in the use of TriMet services.  Federal regulations pertaining to discrimination in public transportation provide

> [i]t is not discrimination under this part for an entity to refuse to provide service to an individual with disabilities because that individual engages in violent, seriously disruptive, or illegal conduct.  However, an entity shall not refuse to provide service to an individual with disabilities solely because the individual's disability results in appearance or involuntary behavior that may offend, annoy, or inconvenience employees of the entity or other persons.

49 C.F.R. § 37.5(h).

It is undisputed that Bus #2 was not functioning properly and was out of service.  Plaintiff does not point to any authority for the proposition that Plaintiff had any right to remain on an out-of-service bus.  Plaintiff, nevertheless, contends when facially neutral state actions disproportionately burden the disabled and cause a denial of access or exclusion, the denial or exclusion is "by reason" of the individual's disability.  Plaintiff relies on *McGary v. City of Portland,* 386 F.3d 1259, 1265 (9th Cir. 2004), to support his position.

16 - OPINION AND ORDER

In *McGary* a disabled homeowner brought an action against the defendant city alleging defendant discriminated against the plaintiff on the basis of his disability in violation of Title II of the ADA when the defendant denied the plaintiff's request for additional time to clean his yard to comply with the defendant's nuisance-abatement ordinance.  The district court dismissed the plaintiff's ADA claim on the ground that the plaintiff failed to allege facts "indicating that the City acted 'by reason of' his disability, since non-disabled residents were also subject to the nuisance abatement ordinance."  *Id*. at 1265. The Ninth Circuit reversed and held "facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced."  *Id*. The court noted the Supreme Court has "rejected the suggestion that a discrimination claim under the ADA must include a 'comparison class' that was treated differently."  *Id*. at 1266 (citing *Olmstead v. Zimring*, 527 U.S. 581, 598 (1999)).  The Ninth Circuit pointed out that

> regulations implementing Title II of the ADA . . . require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."

*Id*. (quoting 28 C.F.R. § 35.130(b)(7)).

It is unclear on this record whether allowing

17 - OPINION AND ORDER

Plaintiff to remain on Bus #2 for an indefinite period of time
would have constituted a fundamental alteration of the nature of
TriMet's service, program, or activity.  Neither party, however,
points to evidence in the record to establish whether such a
modification to TriMet's policy would constitute a fundamental
alteration in the nature of TriMet's bus service.  Plaintiff,
however, has identified sufficient evidence in the record to
establish that an genuine dispute of material fact exists as to
whether he was excluded from participation in or otherwise
discriminated against with regard to TriMet's services (*i.e.*, a
public entity's services), programs, or activities by reason of
his disability as set out in *McGary.*

> **3.   Reasonable accommodation.**

As noted, the ADA requires a public entity to
"make reasonable modifications in policies, practices, or
procedures when the modifications are necessary to avoid
discrimination on the basis of disability, unless the public
entity can demonstrate that making the modifications would
fundamentally alter the nature of the service, program, or
activity."  28 C.F.R. § 35.130(b)(7).  Title II of the ADA
imposes liability on a public entity for "not making reasonable
accommodations to the known physical or mental limitations" of a
user of their services.  42 U.S.C. § 12112(b)(5)(A).

TriMet asserts Plaintiff never requested an

18 - OPINION AND ORDER

accommodation, and, therefore, TriMet did not have to provide one.  There are cases, however, in which courts conclude if a plaintiff's disability effectively precludes him from asking for an accommodation, the ADA does not require him to do so.  *See, e.g., Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002)("once . . .  an employer recognizes the employee needs an accommodation but the employee cannot request it because of a disability, the employer must engage in an interactive process with the employee to determine the appropriate reasonable accommodation.").  Viewing the facts in the light most favorable to Plaintiff, a jury could find Plaintiff's disability effectively precluded him from requesting a specific accommodation.  The Court, therefore, declines to grant TriMet's Motion based on the failure of Plaintiff to request a specific accommodation.

        In any event, Plaintiff fails to identify in his Response to TriMet's Motion for Summary Judgment a specific accommodation that TriMet was required to provide to Plaintiff under the ADA in these circumstances.  The Ninth Circuit has made clear that under the ADA a plaintiff is required to identify specific, reasonable accommodations that a defendant failed to provide.  *See, e.g., Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002)("the employee bears the burden of proving the existence of specific reasonable accommodations that

19 - OPINION AND ORDER

the employer failed to provide" (citing *Memmer v. Marin County Courts*, 169 F.3d 630, 633 (9th Cir. 1999)).  At oral argument Plaintiff asserted the accommodation that TriMet was required to make in this case was to "use good eye contact, and smile, lean slightly toward [Plaintiff], and give appropriate cues that [Gallagher] was listening, like saying yes, and um-hmm."  Tr. 8.

It is questionable whether an accommodation of this nature is the kind of specific, reasonable accommodation contemplated by the ADA.  More importantly, however, there is not any evidence in the record from which a rational juror could conclude that Plaintiff would have understood and complied with Gallagher's direction to debark from Bus #2 if Gallagher had smiled, used better eye contact, leaned slightly towards Plaintiff, and gave appropriate cues that he was listening.

The Court notes Plaintiff points to the deposition of French-Davis at which she testified:

> I look at [Plaintiff] as an individual who has some difficulty with understanding certain things but with given [*sic*] the proper information and repetitive talking with him about something he will get it.
>
>                    * * *
>
> Well, I think he would -- I think he might even question the bus driver if he were told -- if he were told you need to get off this bus because it's not going anywhere, he would get off the bus. He just would.
>
>                    * * *

> But if he were told, you know, you need to get off
> this bus and he's asking a question, you know, why
> or what have you, he probably would stay put until
> he gets an answer.
>
>                   * * *
>
> I would believe he would comply with that if they
> told him this bus isn't going anywhere – you know,
> you really need to get on the other bus.  I can't
> say a hundred percent that he would run a [*sic*]
> jump on the number forty [*sic*].  He would probably
> run and ask if it was going to be a number four or
> where it was going.

Decl. of David Shannon, Ex. 3 at 3, 4.  Gallagher and Mitzel
testified they told Plaintiff repeatedly that Bus #2 was not in
service, that it would not be continuing on the Line 4 route, and
that he needed to get on Bus #1 if he needed a Line 4 bus.  The
video submitted by TriMet establishes Mitzel gestured towards
Bus #1 while telling Plaintiff this information.  On this record,
even viewed in the light most favorable to Plaintiff, French-
Davis's testimony is not sufficient for rational jurors to find
without speculation that Plaintiff would have understood or
complied with Mitzel and Gallagher's advice to leave Bus #2 if
either Mitzel or Gallagher had repeated the information more
times.  Moreover, French-Davis did not testify that smiling,
making affirmative noises, and making some unspecified level of
better eye contact would have resulted in Plaintiff complying
with Gallagher's instructions to leave Bus #2.

       On this record the Court concludes Plaintiff has
not made out a jury question as to whether the accommodation he

21 - OPINION AND ORDER

asserts TriMet should have provided is the kind of accommodation required under the ADA or that Plaintiff would have complied with TriMet's instructions to leave Bus #2 and board Bus #1 if that particular accommodation had been provided to Plaintiff. Accordingly, the Court grants TriMet's Motion for Summary Judgment as to that portion of Plaintiff's ADA claim related to TriMet's alleged failure to reasonably accommodate Plaintiff.

**B.   Analysis of Plaintiff's claim for failure to train.**

Plaintiff also alleges TriMet violated the ADA when it failed to "adequately train employees to identify and/or make accommodations for individuals with disabilities like Plaintiff's." As noted, Plaintiff must prove intentional discrimination on the part of TriMet because Plaintiff seeks to recover monetary damages under Title II of the ADA. *See Duvall,* 260 F.3d at 1138.

The Ninth Circuit has not set out a standard for failure-to-train claims under the ADA. The Court, therefore, analogizes Plaintiff's ADA claim to a failure-to-train claim brought under § 1983. In *Carr v. City of Hillsboro*, the court set out the standards for a failure-to-train claim under § 1983 as follows:

> A claim of failure to train requires the plaintiff to show that the failure to provide adequate training or supervision amounts to a policy or custom evidencing a deliberate indifference to the rights of persons with whom the police come into contact. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 380 (1989); *see also*

22 – OPINION AND ORDER

> *Merritt v. County of Los Angeles*, 875 F.2d 765, 770
> (9th Cir. 1989).  This would require Carr to "establish
> a program-wide inadequacy in training."  *Alexander v.
> City and County of San Francisco*, 29 F.3d 1355, 1367
> (9th Cir. 1994).  He cannot simply allege a specific
> type of training that he believes the officers should
> have had.
>
>                        * * *
>
> At best, Carr has identified a specific type of
> training he believes City and School District officials
> should have had.  He offers no evidence, by way of an
> expert opinion or otherwise, that the training program
> of the City or the School District is inadequate.
> Instead, he simply cites the fact of his own arrest to
> support that contention.  This will not carry the day
> for purposes of a claim based on a failure to train.
>
> Furthermore, a plaintiff must also show that the
> inadequate training program "actually caused" the
> constitutional violation.  *City of Canton*, 489 U.S. at
> 391.  Courts must ask:  "Would the injury have been
> avoided had the employee been trained under a program
> that was not deficient in that respect?"  *Id.*

497 F. Supp. 2d 1197, 1210-11 (D. Or. 2007).  As the Supreme

Court noted in *City of Canton*, the fact

> [t]hat a particular officer may be unsatisfactorily
> trained will not alone suffice to fasten liability on
> the city, for the officer's shortcomings may have
> resulted from factors other than a faulty training
> program.  It may be, for example, that an otherwise
> sound program has occasionally been negligently
> administered.  Neither will it suffice to prove that an
> injury or accident could have been avoided if an
> officer had had better or more training, sufficient to
> equip him to avoid the particular injury causing
> conduct. Such a claim could be made about almost any
> encounter resulting in injury, yet not condemn the
> adequacy of the program to enable officers to respond
> properly to the usual and recurring situation with
> which they must deal.  And plainly, adequately trained
> officers occasionally make mistakes; the fact they do
> says little about the training program or the legal
> basis for holding the city liable.

23 - OPINION AND ORDER

489 U.S. at 390-91 (citations omitted). *See also Ting v. United States,* 927 F.2d 1504, 1512 (9th Cir. 1991)("[T]he fact that the agents may not have been trained in every conceivable hostile arrest scenario . . . would not render the training inadequate.").

TriMet notes failure-to-train claims against TriMet have been rejected by the United States District Court in Oregon in *Whitfield v. Tri-Metropolitan Transportation Dist*rict, No. 06-1655-HA, 2009 WL 839484, at *1 (D. Or. Mar. 30, 2009). TriMet also asserts Plaintiff has not established in this case that TriMet failed to adequately train its employees.

In *Whitfield* a fare dispute arose between a TriMet bus driver and the plaintiff, an allegedly disabled passenger, as to whether the plaintiff's bus ticket was valid. 2009 WL 839484, at *1. The bus operator asserted the ticket presented by the plaintiff was invalid and continued to insist that it was invalid after another passenger advised the operator that he had seen the plaintiff purchase the ticket. Ultimately, the operator radioed TriMet dispatch, reported the plaintiff was acting in a threatening manner, and requested assistance. Dispatch notified Portland Police Department. Two Portland police officers arrived and, after further interaction, removed the plaintiff from the bus, handcuffed him, and arrested him. The plaintiff brought an action against TriMet and the Portland Police Department and

24 - OPINION AND ORDER

alleged, among other things, that TriMet violated the ADA because
it failed "to properly train its employees to identify,
accommodate and provide appropriate aids and services to disabled
persons." *Id.*, at *2.

Judge Ancer Haggerty denied TriMet's motion to dismiss
in an earlier opinion concluding the plaintiff's theory was
"novel," but allowed the plaintiff to proceed on a claim under 28
C.F.R. § 35.130(b)(7), which requires a public entity to "make
reasonable modifications in policies, practices and procedures
when the modifications are necessary to avoid discrimination on
the basis of disability[.]" *Id.*, at *8.  Judge Haggerty,
however, ultimately granted TriMet's motion for summary judgment
on this claim:

> [T]here is nothing presented in the record
> supporting an allegation that TriMet failed to
> train its bus operators adequately regarding
> disability issues, or failed to properly train the
> driver at issue in this case.  Plaintiff points to
> no evidence that would give rise to any inference
> in this regard, and this court's examination of
> the record finds none.

*Id.*

Similarly, in *Midgett v. Tri-County Metropolitan
Transportation District of Oregon*, 74 F. Supp. 2d 1008 (D. Or.
1999), the court granted TriMet's motion for summary judgment as
to the plaintiff's claim for damages under the ADA citing
TriMet's extensive efforts, including training, to comply with
the ADA.  The court concluded the plaintiff had "presented no

25 - OPINION AND ORDER

evidence from which a rational inference of discriminatory intent can be drawn." *Id.* at 1018.  The court pointed out that

> Tri-Met has over 2,400 employees, of which approximately 1,300 operate buses.  To meet its accessibility goals, Tri-Met first placed accessible buses in service in the 1980's and began training new employees in accessibility at that time.  The details of Tri-Met's training program are described in the Declaration of Adrian Moy, and will not be recited here.  To summarize, however, the training programs, which have been revised over time, contain many ADA-related components, including a formal ADA orientation, classroom and on-the-job instruction in lift operation and securement, practical training on every type of bus in the fleet, sensitivity training and what plaintiff refers to as "attitudinal" training.

*Id.*

Here TriMet points to evidence in the record that establishes TriMet has an extensive ADA training program that includes a formal orientation on the ADA, classroom and on-the-job instruction, sensitivity training, and other employee training activities.  In addition, TriMet's 67-page Disability Awareness Handbook includes nearly 20 pages of material related to dealing with passengers with cognitive impairments including a summary of the broad spectrum of disabilities that a bus driver could encounter.  The record reflects both Gallagher and Mitzel took and completed training on the ADA when they began their employment with TriMet as well as refresher courses throughout their employment that included information on disability awareness.

Plaintiff does not cite to any testimony by experts or

26 - OPINION AND ORDER

TriMet employees who are responsible for disability-related
training that compares TriMet's training with that of other
transportation districts or that indicates TriMet's training is
inadequate.  Instead Plaintiff points to deposition testimony by
Gallagher that he believed Defendant did not "have that much"
training for employees that was specific to dealing with
individuals with cognitive disabilities.  McHenry Decl., Ex. 2 at
27.  Gallagher, however, also testified he had received in-class
and on-the-job training related to dealing with disabled
individuals for two days in 2007 as well as a one-day refresher
or recertification class in 2011.  Gallagher testified he had
also taken various training classes in 2008 and 2009.  Gallagher
testified he was taught in his ADA training that the overarching
concern when dealing with individuals with cognitive disabilities
was "just being able to take your time and answer questions[,]
that you keep giving an answer over and over, and giving them
extra time to get settled in."  *Id*. at 31.

        Plaintiff also points to Mitzel's testimony at
deposition that she received training on recognizing cognitive
disabilities in 2001 when she was hired and took a
recertification class with some ADA information "throw[n] in"
during 2011.  McHenry Decl., Ex. 3 at 4, 6.  Mitzel, however,
also testified bus operators are required to take recertification
classes every year, "some ADA is in every class," and TriMet's

27 - OPINION AND ORDER

ADA training is "fairly extensive."  *Id*. at 6-7.

On this record the Court concludes Plaintiff has not established a genuine dispute as to a material fact exists as to whether TriMet failed to provide adequate training and supervision constituting deliberate indifference to the rights of disabled persons with whom TriMet bus operators come into contact.  Accordingly, the Court grants TriMet's Motion for Summary Judgment as to Plaintiff's ADA failure-to-train claim.

**C.  Monetary damages under Title II of the ADA.**

As noted, in cases such as this one in which a plaintiff seeks to recover monetary damages under Title II of the ADA, the plaintiff must prove intentional discrimination on the part of the defendant.  *Duvall,* 260 F.3d at 1138 (citation and footnote omitted).  The applicable standard, again as noted, is "deliberate indifference," which requires the defendant to have knowledge that harm to a federally protected right is substantially likely and to fail to act upon that likelihood. *Id*. at 1138-39.  "[I]n order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness."  *Id*.

To support his claim that TriMet was deliberately indifferent to Plaintiff's rights under the ADA, Plaintiff asserts "there is evidence that [Gallagher] found [Plaintiff's]

28 - OPINION AND ORDER

situation amusing."  Specifically, Plaintiff points out that the sound of laughing can be heard during the call Gallagher made to dispatch and Gallagher testified it "could be" him.  Gallagher's entire testimony on the matter is as follows

(Audio recording played.)

Q.    Who's laughing?

A.    I don't know who's laughing.

Q.    Is that you laughing?

A.    Doesn't sound like my laugh.

Q.    Could that be you laughing?

A.    Could be, but

Q.    Could it have been anybody other than you or the
      police officers?

(Audio recording played.)

Q.    Who says, "Ha, ha, ha, ha, ha, okay"?  Is that
      your voice?

A.    No. I don't know who that was.

(Audio recording played.)

Q.    And you don't think that's you?

A.    I don't think that's me.

Q.    Did you find anything funny about that situation?

A.    I did not.

Q.    Did you think it was odd that the police officers
      were laughing?

A.    No.

Q.    Did you hear them laughing?

> A.    I hear somebody laughing.
>
> Q.    And you didn't think it was odd that they were laughing?
>
> A.    Could been another passenger out front.  I no -- I don't recall who that was.
>
> Q.    Okay.  Well, a second ago, you said it was either you or the police officers.  Were there other passengers around?
>
> A.    You never asked me if that was me or the police officers.  I told you I don't know who's laughing.
>
> Q.    Was there anybody around other than you or the police officers at that point?
>
> A.    There were people who were waiting on the platform to get onto another bus.
>
> Q.    And can you remember, were they close enough to you that they would have been picked up on the recording there?
>
> A.    I was standing out on the platform, so anybody who was out there could have been.
>
> Q.    Okay.
>
> A.    When I made the calls, I wasn't on the bus.  I was outside.
>
> Q.    Okay.

McHenry Decl., Ex. 2 at 51-53.  Thus, Gallagher testified he did not know who was laughing on the audiotape, he did not believe he was laughing, and it could have been any number of people laughing unrelated to this incident because Gallagher was outside on the platform when he made the call and there were people around.  Gallagher's testimony, therefore, does not give rise to an inference of deliberate indifference.

30 - OPINION AND ORDER

Plaintiff also points to the fact that Gallagher did not want to write a report about the incident because doing so would have extended his work day.  The record, however, reflects TriMet generally did not require employees to write incident reports unless they were involved in an accident or an injury on the bus.  In addition, dispatch did not request Gallagher to write a report on the night of the event.

Plaintiff also asserts the fact that Gallagher asked the transit police for assistance supports his claim, but the record reflects TriMet operators are trained to ask for assistance from the transit police if they are available and operators are having problems with a passenger.  The fact that Gallagher asked the transit police for assistance, therefore, does not give rise to an inference of deliberate indifference.

After viewing the facts in the light most favorable to Plaintiff, the Court concludes Plaintiff has shown, at best, that TriMet employees may have failed to fully appreciate the extent of Plaintiff's disability or to interact with Plaintiff in the most patient and kind manner.  The Court concludes on this record, however, that Plaintiff has not established any genuine dispute as to a material fact exists as to whether TriMet was deliberately indifferent to a harm to Plaintiff's federally protected right or intentionally discriminated against Plaintiff. The Court, therefore, grants TriMet's Motion for Summary Judgment

31 - OPINION AND ORDER

as to Plaintiff's ADA claims.

<u>**CONCLUSION**</u>

For these reasons, the Court **GRANTS** TriMet's Motion (#42) for Summary Judgment and **DISMISSES** this matter **with prejudice**.

IT IS SO ORDERED.

DATED this 9th day of November, 2012.

/s/ Anna J. Brown

_____

ANNA J. BROWN
United States District Judge

32 – OPINION AND ORDER